May it please the Court, I represent the California Public Utilities Commission and am arguing on behalf of all appellants. Appellants here are the Commission, numerous agencies of the State of California, which are represented by the Attorney General, the City and County of San Francisco, and the California Hydropower Reform Coalition, which is an association of conservation groups. The question presented is whether the notwithstanding clause of Section 1123A of the Bankruptcy Code expressly preempts all non-bankruptcy law, state or federal, civil or criminal, that would otherwise prohibit, regulate, or apply to the implementation of a Chapter 11 plan. The key text in Section 1123A reads, quote, Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall, I'm moving to Section 5, provide adequate means for the plan's implementation. End quote. Under the syntax of the key text, non-bankruptcy laws are displaced to the extent that they would otherwise apply to what a plan shall provide. In other words, the Bankruptcy Code requires a plan that includes each of the elements specified in Section 1123. The notwithstanding clause preempts non-bankruptcy laws that would otherwise interfere with that exclusive control of the section over plan contents. Section 1123A, however, does not displace laws that regulate the legality of plan implementation. The argument is that Congress passed a law that doesn't mean what it says. Well, no, Your Honor. It's in fact that Congress passed a law that means exactly what the committee that wrote it said it means. The 1980 report of the House Judiciary Committee, which was contemporaneous with the drafting of the phrase that was ultimately enacted in 1984, says that the amendment, quote, makes it clear that the rules governing what is to be contained in the reorganization plan are those specified in this section. End quote. So, in other words, the domain of the preempted laws is limited to that that would otherwise regulate what is to be contained in the reorganization plan, not, as PG&E would have it, laws regulating the substantive legality of plan implementation. Let me focus, if I may, subject, of course, to any questions on two principal themes. First, PG&E's interpretation of Section 1123A would gravely injure important governmental interests, in this case and in future cases. The district court's decision, if not reversed, would allow a plan proponent, through its choice of plan design, to substantially nullify the regulatory authority of federal, state, and local governments over debtors implementing a plan of reorganization or liquidation. Second, PG&E's arguments fall far short of demonstrating the clear and manifest purpose of Congress, as the presumption against preemption provides. Nor do PG&E's arguments justify a departure from the long and deep congressional and judicial history of structuring and interpreting the Bankruptcy Code so as to preserve regulatory law. That tradition is surveyed in the Supreme Court's Midlantic and BFPV Resolution Trust decisions, and also in this Court's Baker and Drake decision. Let me turn for a moment to how PG&E's theory would function in this case. PG&E seeks to preempt numerous regulatory laws that preempt public safety and welfare. For example, PG&E seeks to disaggregate in violation of Section 377 of the California Public Utilities Code. That section prohibits vertically integrated electric utilities, such as PG&E, from selling or disposing of their in-state generation facilities. The California legislature ---- The laws that were going to be affected, they did list that, didn't they? Section 377 was listed in the disclosure statement, although PG&E's disclosure statement also says that the preempted laws include but are not limited to those listed in the disclosure statement. Its theory is that preemption occurs simply by virtue of listing a transaction in the disclosure statement, whether or not the preempted laws are even identified to the bankruptcy judge and the parties, much less whether there's an opportunity for judicial inquiry. And the lawyer's boilerplate for this is all we can think of at the moment, isn't it? Yes, but it's a very dangerous interpretation of the code, since it would permit essential preemption unknown to any of the parties or the judge at the time. The theory is that if the transactions in the plan and the plan is approved ---- PG&E says state laws, but its theory requires that Federal laws be included as well, are displaced whether or not anyone knows that that displacement will occur during the bankruptcy case. Your position is that Judge Williams went too far, that Judge Montali had it right, that PG&E ought to have to establish exactly which laws would be implicated by their plan? Well, our theory is certainly that Judge Montali got it right, but our theory is that the notwithstanding clause of Section 1123A doesn't preempt regulatory law applicable to the substantive legality of planned transactions at all. It has a different function. Principles of implied preemption are available for a case-specific inquiry into the compatibility of the purposes of state laws with the purposes of the bankruptcy code. And that question was not yet decided by Judge Montali? That's absolutely correct. It was reserved by Judge Montali for further proceedings. It wasn't decided by the bankruptcy court. It wasn't decided by Judge Walker in the district court. As I read Judge Walker's opinion, I had trouble deciding whether he had in fact decided not only the express but also the implied preemption question. Well, I think this brings me to one of the difficulties in PG&E's argument. PG&E has to explain why the notwithstanding clause was referred to throughout the legislative history as technical and stylistic. It tries to do so by saying that the 1978 code, as originally enacted, already impliedly preempted all of this regulatory law. That isn't an argument about implied preemption as applied to the facts of this particular case. It's rather an effort to reconcile the legislative history with PG&E's theory. And we submit that it fails for reasons that are discussed in our briefs. Very briefly, there's absolutely nothing in the text of Section 1123A as enacted in 1978 without the notwithstanding phrase that could possibly support PG&E's position. This Court's decision in Baker and Drake sets forth the governing law here on implied preemption, and applying Baker and Drake to the 78 text of Section 1123 leads ineluctably to the conclusion that there was no implied preemption. Second, Section 1123A as enacted in 1978 was based on predecessor provisions in the Bankruptcy Act. As we discussed in our briefs, and as PG&E does not dispute, there was no preemption of State law applicable to plan implementation, no blanket preemption of the kind PG&E argues for under the Bankruptcy Act. There was no change from the Bankruptcy Act to the Bankruptcy Code, and in consequence, there was no preemption of this kind under the Code as enacted in 1978. Furthermore, the presumption against preemption requires that any doubt about the meaning of the 78 Code as enacted in 78 be resolved against preemption. So PG&E's argument that the Code as enacted in 78 preempted in blanket fashion regulatory law applicable to plan implementation really collapses. And if that argument collapses, then PG&E's argument about the meaning of the current Code does so as well, because PG&E then has no explanation for the repeated description in the legislative history of the 84 edition of the Notwithstanding Clause as technical and stylistic. If I may, let me talk for just a moment about the application of PG&E's theory in this case. As I said, PG&E seeks to preempt Section 377 of the California Public Utilities Code. That section, the California legislature enacted that section because it believed that sales of in-state generation facilities by vertically integrated utilities would enable generators to divert electricity away from California or to withhold electricity and could result in supply insufficiencies, blackouts, and market manipulation. PG&E's plan in defiance of Section 377 would permanently force on California a disaggregated structure for its largest electric and natural gas utility. The decision whether to maintain traditionally structured, vertically integrated electric utilities or whether to encourage or mandate disaggregation is among the most fundamental current policy choices in utility regulation. The Federal Power Act reserves that policy choice to the states. PG&E has never disputed that point. And the states, in turn, are approaching this policy question in different ways, depending on local conditions and views. According to the website of the Energy Information Administration of the U.S. Department of Energy, as of February 2003, 17 states in the District of Columbia were actively pursuing some form of restructuring for their electric industries. Twenty-six states were not. Six states had delayed restructuring. And one state, California, has suspended restructuring. A highly useful article published last year by Judge Jacques Cahie of the Seventh Circuit, entitled Electric Deregulation After California, Down But Not Out, surveys the policy issues. We've provided the citation to the courtroom clerk. Now, even apart from Section 377, California law requires prior approval by the Public Utilities Commission for transfers of property related to a utility's public duties. PG&E wants to preempt those laws as well in order to achieve an undemocratic judicial deregulation. PG&E also proposes to divest the nation's largest privately owned hydroelectric system without review under the California Environmental Quality Act of any environmental impact that the disaggregation transactions may have as a whole. I've already explained that PG&E's theory of automatic and self-executing preemption is that regulatory laws are preempted in the words of the disclosure statement, quote, whether specified here or not, end quote. But neither a utility debtor nor respectfully even a bankruptcy judge has the institutional competence or democratic mandate to formulate a state's energy policy, and that's what's involved here. So your argument is, in a sense, if anybody's going to screw it up, it's the legislature. Exactly. This is a policy question consigned by the Federal Power Act to the legislature. It's a hugely momentous policy question for each state. States can resolve that question differently depending on local conditions like the price of electricity and supply issues. And the Bankruptcy Code should not upset the regulatory balance struck by the regulation. Putting aside, this Court, of course, will, we presume, want to consider the consequences of PG&E's theory not just for this case but for other bankruptcy cases. And I'd like to turn to that for just a moment. PG&E's theory will necessarily require displacement of federal regulatory law as well as state and local law for reasons addressed in our briefs. For example, the district court effectively acknowledged that PG&E's position would allow a debtor to undertake a merger under a plan, even if that merger would be in violation of the Clayton Act or of state antitrust laws, some of which regulate mergers. Or to offer another example, Chapter 11 plans routinely propose the sale or other disposition of a debtor's property. On PG&E's theory, such a plan provision would automatically preempt any regulatory law applicable to the proposed disposition. The preempted laws would include laws regulating or prohibiting a proposed one-time sale or abandonment of environmentally hazardous property. So PG&E's theory, in effect, would overturn the result reached by the Supreme Court in the Midlantic case as applied to plan implementation. Many, many other examples could be given. Could you help me with the following textual question? I'm just reading 1123A, which provides, of course, notwithstanding any otherwise applicable non-bankruptcy law, da-da-da. As you would have us read that, there is express preemption of some, but not all, non-bankruptcy laws. What non-bankruptcy laws are expressly preempted by this clause? Well, they are non-bankruptcy laws that would apply to plan contents. And let me give you an example. The notwithstanding phrase, of course, grammatically modifies all seven subsections of Section 1123A. So the phrase need not actually preempt or displace any non-bankruptcy laws as to each subsection. Now, as applied to subsection 6, for example, the notwithstanding clause would preempt any State laws or provisions in a debtor's corporate charter requiring, for example, board approval before a plan may propose the charter amendment required by subsection A-6. This is a real concern. The plan has to contain the A-6 amendment, but many corporate charters say that only the board can propose a charter amendment. And the plan proponent, of course, is not necessarily the debtor. So State law or charter provisions of a corporation enforceable under State law saying that only the board may propose a charter amendment would be preempted. Now, why is that expressly preempted? Because that strikes me as, under State law, for those who passed it an important structural provision as to how a corporation ought to be organized. Yet you're saying that here, where we have a State law, which is also very important as to how a corporation ought to be organized, that's not expressly preempted. Well, let me be very clear. I see I'm eating into my rebuttal time, but I want to address your question, of course. We don't say that State law regulating the contents of charter provisions is preempted. As we say in our reply brief, in fact, it's clear from the history of the Code that those laws are not preempted. The Bankruptcy Code doesn't allow a reorganized debtor to have a charter provision that is substantively illegal under State law. But the Bankruptcy Code does provide that the plan may propose a charter amendment required by A-6 without first obtaining the approval of the Board of Directors, just as that charter amendment is then approved through the plan of voting by classes or crammed down in a confirmation order stipulated in the Bankruptcy Code, rather than, for example, voting by shareholders, which might be the process for charter approval outside a bankruptcy case. Briefly, many other examples could be given of preempted laws. If a debtor wanted to sell retail inventory under a plan, PG&E's theory would preempt consumer protection laws, laws regulating going out of business sales, and laws governing the sale of regulated items raising from guns to pharmaceuticals to fertilizer. If a debtor public utility wanted to sell environmentally sensitive watershed lands, PG&E's theory would preempt State law requiring regulatory approval. If a debtor wanted to demolish a historically significant building in order to maximize the value of the debtor's property in a plan, PG&E's theory would preempt laws on a one-time basis, prohibiting the demolition or requiring regulatory approval. Indeed, although PG&E's brief says that Section 1123A does not preempt State tax laws, it's hard to see why the theory doesn't require that result. Sales taxes, for example, are plainly non-bankruptcy laws that would otherwise apply to a sale of property pursuant to a plan. The Bankruptcy Code simply doesn't subjugate State, Federal, and local regulatory interests to private interests in maximizing the value of a plan, as PG&E's theory necessarily implies. Thank you, Your Honor. Thank you for your argument. You have about two and a half minutes left. I assume that we would hear from Mr. Clare next. Is that right? Yes, sir. Good morning, Your Honors. May I please support? I'm Jeffrey Clare, Justice Department Counsel for the United States, as amicus curiae in this case. Fine. Thank you, Your Honor. We echo many of the same points and themes that Mr. Rieman has struck with you this morning. Our central contention for the Court is that a petition in bankruptcy does not give the debtor, does not give any debtor license to be free from compliance with other laws that protect the public health, safety, and welfare. The Bankruptcy Code is, of course, an elaborate scheme for adjusting creditor-debtor relations. It gives the debtor extraordinary powers within that realm to do things with respect to paying debt or not paying debt that a debtor could not do outside of bankruptcy. But in the case of compliance with regulatory or police power laws, be they State or Federal, it is our position that the debtor, like anyone outside of bankruptcy, must comply with those laws and must structure a reorganization that in turn complies with those laws as well. Much of PG&E's briefing in this case is devoted to showing the Court that there's really nothing to worry about here. We have been accused of dangling the proverbial parade of horribles before the Court, and there is a long briefing as to why the reach of PG&E's interpretation is not so broad as the other parties in the case would have it. We are advised that this interpretation applies only to transactions that occur at the inception of the plan, at the moment of restructuring, and it therefore does not sanction ongoing activity out of compliance with other law. We are advised that there are structural limitations within the Code that would prevent even those transactions from taking – from being conducted in a way that was out of compliance with criminal law, trading with – laws such as trading with the enemy and so forth. We accept all these limitations on the interpretation offered by PG&E, yet even as so limited, even as so confined, there is still an extraordinary and, from our perspective, quite problematic impact on the power of the State government and the power of the Federal government to regulate a debtor's conduct. And one need look no further than the transactions proposed in this case to see why that is so. PG&E proposes to transfer its license to operate a nuclear power plant to a different entity. Such transfers under ordinary Federal law must be approved by the Nuclear Regulatory Commission, which determines whether the transferee will have the necessary technical ability and financial wherewithal to operate the plant safely into the future. As we read PG&E's interpretation of the Bankruptcy Code, should the Nuclear Regulatory Commission refuse to transfer the license, they would assert authority under the provisions at issue here to preempt the expert administrative determination of the Nuclear Regulatory Commission and to have the bankruptcy court compel the transfer of the license to newly established entities created by the reorganization plan. So what does the notwithstanding clause mean? Your Honor, this is an introductory proviso that in conventional statutory draftsmanship signals that the provision, in the event there is a conflict between some other law and the provisions that follow, the Bankruptcy Code will prevail. It starts at the beginning of Section 1123 and, as Mr. Rieman indicated, is followed by seven enumerated subsections. It does preempt state laws that would conflict with some of the powers granted by some of these subsections. For example, Subsection A6 effectively precludes a debtor from proposing a corporate arrangement that would have voting arrangements in making corporate decisions that do not recognize the equity percentages of all the holders in the corporation. There is a case cited in our brief at page 28, the Henry Cajun Electric case, where the bankruptcy court held that state laws governing rural electric cooperatives that did have a one-person, one-vote principle regardless of the equity percentages that each person held were preempted by this provision. So there is some substantive effect. By the same token, the first three sections of the of Section 1123 deal with matters that are self-evidently covered exclusively by the Bankruptcy Code. How will creditors' interests be classified? What does the plan provide with respect to the treatment of creditors who are impaired? These are matters that virtually by definition are covered exclusively by the Bankruptcy Code. So I think it's obvious from the structure of this provision that the notwithstanding proviso as Congress envisioned it does not have full effect with respect to all the subsections as follows, but as this Henry Cajun Electric Corporation case indicates, it does have effect with respect to some. And really that's all the Court need find. There is a maximum of statutory construction that the Court should not find this proviso or any provision of the statute to be mere surpluses. That does not mean it has to have great effect, that it does not mean that the provision in question has to operate most of the time. It means only that it has to have some effect. And it does have some effect. But even on your theory, the word any sounds like a surplusage because you would replace any with some. Well, Your Honor, it would displace any law that conflicts with the powers that are granted in the following subsections. And it does make clear that Congress did not intend to carve out any exceptions. Where there is a conflict with the powers granted in one of these subsections, then any law is displaced. But that does not indicate that the powers granted in the following subsections necessarily and invariably conflict with other law. They do not. And, again, as the first three or four subsections of 1123 indicate, Congress must have understood that because it has the proviso introducing those subsections. But those subsections, in turn, deal with matters that are never covered by State law. They are covered exclusively by Federal law. The legislative history, moreover, bears out that the notwithstanding proviso was not intended to have great effect. This is a proviso that, as the briefs indicate it, was added in 1984. And the legislative history is detailed in all the parties' briefs, and such history as there is indicates that Congress regarded it as a technical or stylistic amendment. There is no discussion anywhere in the legislative history that these six words were intended to cut a wide swath through Federal or State police power or regulatory law. And that itself, that omission is itself a telling omission here. Surely had Congress intended to give this provision, this introductory proviso, the extraordinary reach that PG&E says it has, there would have been some reference somewhere on the floor of Congress in a pertinent committee report, in a hearing, something that suggests that Congress really did intend to have such an intent. None of the parties have come up with any evidence of that here. Moreover, the principle of construction applicable to bankruptcy, the Bankruptcy Code, holds that where there is a concept or a provision in the Code that has a predecessor in the bankruptcy laws that came before, the prevailing judicial construction of those predecessor provisions should be regarded to continue in effect unless Congress has said something explicitly to the contrary. And, again, there's no evidence of that here. The reorganization provisions, without the notwithstanding proviso, that are in 1123 date back to 1934. Starting in 1934, and this is outlined again in the briefs of the parties, Congress provided that a debtor in reorganization had the authority to list in its plan adequate means for the term at the time was executing the reorganization plan. There was more than 40 years of judicial construction of that provision before Congress reenacted a similar provision in 1978. Yet there is no case that holds that this provision has the kind of extraordinary preemptive scope that has been attributed to it by PG&E here. Indeed, such case law as we have been able to uncover from construing these predecessor provisions of the code is consistent with the position that is argued by the state and is argued by the United States, and our brief is amicus. We have cited a case indicating that the reorganization plan has to comply with applicable provisions of the antitrust provisions, another provision that another case holding that a reorganization plan had to comply with state law governing corporate organizations. I cannot tell you that there is an overwhelming line of precedent, but such precedent as we have been able to uncover is consistent with our interpretation. A judicial reading of these predecessor provisions that is contrary to the interpretation PG&E has advanced to you here. There is in the text of the statute itself a directive, moreover, that the means selected by the proponents of the reorganization plan be adequate. This, too, we think is an indication that Congress was looking to the legal sufficiency of the means proposed. And really we take it as an affirmative directive that the debtor in structuring a reorganization plan has to comply with other non-bankruptcy law. Thank you for your argument. Thank you, Your Honor. Mr. Tribe. I wish I were taller. May it please the Court. I'm representing the appellees in this case, and I'm counsel for PG&E Corporation. I think everyone agrees that 1123A preempts something. The question is what. And with respect to Judge Fletcher's question, does any mean some, I think I heard the answer that, well, I suppose it means some in the sense that they think the only laws preempted are those that deal with planned content. Now, that's, let me say, inconsistent to begin with, with their own position as to 1123A-6, which clearly goes beyond content, deals with substance. Indeed, PG&E is told in the CPUC plan that under their plan, PG&E's articles of incorporation and bylaws would have to be amended to ban the issuance of nonvoting stock, quote, as required by 1123A-6, unquote. That's Section 7.4C of their plan. I think that the Court has already had experience with reading any to mean something less than any. This is not exactly Rucker redux, but at least in that case, there were important reasons, constitutional reasons for not stretching any as far as the U.S. Supreme Court finally did. In this case, there are no reasons. Judge Hawkins and I may have particular sensitivity on this point. We lost at 8-0. That's correct. I'm not inclined to accept the argument that I get to go back on that one. No, I'm afraid I'm agreeing with Chief Justice Rehnquist that any means all unless there is some even more compelling reason than in Rucker, and this is less compelling, not more. In this case, there is no particular reason to suggest that Congress didn't know what it was doing. It is suggested — Well, there is a lot of reason to suggest that Congress did not know what it was doing. Well, sometimes it doesn't know. I mean — Well, it may be here that it didn't know what it was doing. Well, let me suggest not. Let me suggest not, Judge Fletcher. It's not like Gibson v. Chrysler where maybe when they passed 1367, some of them didn't quite know. All of my opinions were raised in this argument. No, I'm interested in 28 U.S.C. 1367 for other reasons, and I encountered it. But it does seem to me that in this case the reason that they thought they weren't doing a great deal in 1984 is that, in fact, all the way back to 1934, and let me rehearse the history in a moment, there was this very simple preemption. It's not a large footprint, as I'll explain. It's a rather surgical one, perpendicular to the reactions and transactions on the ground. We're talking about paper reorganization principally, and with respect to that, it's been clear for a long time that it was a purely federal matter. But let me return to the point that any means of what it says here, because when Judge King opened by asking, are they really saying that this law doesn't mean anything, I think the real answer to that was yes, because if all that 1123A is about is about plan content, disclosing to creditors and investors what the plan says, then it's wholly redundant of 1125, which already covers the information that must be disclosed. And it would be quite paradoxical, if you look at 1125D, it goes out of its way to specify the very limited role that state regulators have, even when they are complaining about the inadequacy of the disclosure of plan content. In 1125D, it says that they have a right to be heard, but not heeded. Basically, they are allowed to comment. But the governing law, the governing law is purely federal on the question of adequacy of disclosure. Now, what sense would it make if the states had the broad veto power that they're urging, namely that if they think it's against public policy to allow PG&E to disaggregate, they can simply say no, that it's state law that prevails, even though this is a perfectly lawful reorganization within the context of Chapter 11. What sense would it make to say that it is only federal law that governs the adequacy of disclosure? What sense would it make to read 1123A.6, which also is phrased in exactly the same way, the plan shall provide for, in a substantive way, as the Department of Justice does when it cites Cajun Electric, but to read 1123A.5 in a purely literary way, that it's only about plan content? They do have a theory here. They say that the reason that there's a difference between A.5 and A.6 is that with respect to A.5, everything that is an implementing transaction is either already fine under state law, and so you don't need any separate substantive federal empowerment provision, or if it's not fine, there's another provision of the federal bankruptcy code that provides the substantive power. And they point to 1124.2. The fact is that both branches of their argument are wrong. The simple implementing provision of transferring property is not always fine under state law. Section 377 in California shows you why that's so. Indeed, it will often be the case that transfers of property, mergers, acquisitions, the bread and butter, ordinary nuts and bolts of reorganization, will have no affirmative authority in the bankruptcy code other than through 1123A.5, so that the truly radical position here is the one that says we're simply going to pick the props out from under the bankruptcy code by eliminating the affirmative authority that courts have relied on implicitly and sometimes explicitly for decades. With respect to their claim that 1124.2 is really the source of authority for those implementing transactions that involve impairing claims or curing defaults, which are absolutely central to the bankruptcy system, if you look at 1124.2, it is not a source of power at all. 1124.2 simply defines what an impaired and an unimpaired claim is. And this Court's decision in Enswite in 1988 made clear that it's 1123A.5g that is the source of power for impairing claims. The U.S. Supreme Court in the case of Rake v. Wade in 1993 reached exactly the same conclusion unanimously with respect to the parallel provision in Chapter 13. Now, if we had precisely this case in front of us in 1979. Same result. Because? Because the code in light of its structure and language and history could only have been read to take away from the States the invitation that had been extended from 1938 to 1978, explicitly giving the public utility commissions a place at the table and a veto. When Congress withdrew that in 1978 from public utilities, giving them only the specific residual power to approve the rate changes in plans, not even the whole plan, just the rate changes in plans in 1129A.6, but left the railroad regulators at the table and then added the municipal regulators in 1984, the only way to 88, sorry, the only way to understand that is that the exclusively federal process of deciding at the moment of implementation, which might take days or weeks for bureaucratic reasons, but conceptually could happen all at once. It's a phase shift, as it would be in quantum theory or something. You're going from State A to State B, one organization to another, and it is a federal province. And the role of the States is by invitation of the federal government. If I could go back to 1934. To make sure I understood your answer to my question. I think I understood your answer to be premised not on whether the bankruptcy law was changed then, but rather because other non-bankruptcy law were changed. No, no. I'm sorry, Judge Fletcher. It was the bankruptcy code that was changed. In 1978, the bankruptcy code took away the invitation that the public utilities had, so that in 1979 they would have no longer been invited guests, in effect. That is, the notwithstanding language when it was added was icing on the cake. It clarified matters. It showed that it wasn't only the utilities, but others as well. Outside of public utilities. Correct. What consequence is there, if any, in changing bankruptcy law, adding the clause in 1980? I think it makes the case much easier. That is, it eliminates any residual doubt. Now, what makes the case much easier? The inclusion of the language in 1984, notwithstanding any non-bankruptcy law to the contrary, makes easier the case that there is complete preemption with respect to the implementing transactions, not only in the public utilities area, but in telecommunications and other areas. But I would be prepared to argue, even in the absence of that clarifying language, that there was a very strong case to be made. The reason is, and it's certainly not true, as Mr. Reimer claims, that we concede the contrary. The reason is that there's nothing new about the position that the implementing transactions are governed exclusively by Federal law. If you look back in the brief, first of all, let me step back for one moment. There certainly is language in the legislative history that suggests that this clarifying language was not simply hot air, that it did mean something. That is, in particular, Senator Dicconcini, and it's referred to in excerpts of Record 247 by the district court, Senator Dicconcini made clear that he thought this language established clearly that substantive provisions, provisions that were matters of substantive law and not just matters of what is the content of the plan, were going to be preempted. But the predecessor of that law, in 1938, Section 216.10, was uniformly treated by the Federal courts as having given affirmative authority for the transactions it described. And that's the key. That is, the question is, is the language here and its predecessor going all the way back to 1938 and then 1934 empowering or is it merely descriptive? If it is empowering, then it's a simple axiom of Federalism that when Congress says that a bankruptcy court is empowered to do X, for a state to say, well, not if we think it's a bad idea, is clearly impermissible. And the only reason that things look a little different from 1934 to 1938 is that, as our brief points out, footnote, I'm losing track of which footnote. But the CPUC argument is that a plan was required to comply with state law between 1934 and 1938. They are relying on authorities who were discussing, in fact, only the 1934 Act. That Act contained a section, 77BF7, that required, by its text, compliance with state law. And if you study it, you'll see it was not limited simply to the issue of whether a transaction was ultra viris. That section was deleted in the 1938 Act. And in their brief, they cite, for example, Learned Hand, the 1942 opinion, making it look like, even when that language was gone, there was simply a background principle that said that state law governs. The fact is that if you look at the Learned Hand opinion that they cite in Baker's share, it turns out he was discussing the 1934 law before that provision was deleted. So here's the situation. As of 1938, Congress had taken state regulation and state regulators out of the bankruptcy reorganization business, except where it entrusted the entire matter to state regulators, which it did with respect to banking and with respect to insurance, and also where it expressly permitted state regulators to wield a state law veto if they wished, which it did with respect to public utilities and railroads. The only reason they had that veto is that they were allowed, as a matter of federal law, to exercise it. It was a state law veto they were exercising, and that invitation was withdrawn in 1978. It seems to me that that completes the case. Now, the suggestion is made that it's a bad idea because if we displace state law, some of the state law that's displaced might be terribly valuable, terribly important. But that's up to Congress to say. Congress knows how to preserve a public health and safety and regulatory exception when it wants to. It did that in the automatic stay. 362b-4 says the automatic stay doesn't apply to police and regulatory laws. There, in fact, are specific parts of 1253 which leave room for state public policy, namely the parts that deal with the choice of directors of the reorganized corporation. 1123a-7 and 1129a-5 open a window for state public policy there. There's another limited area that traditional limits on the power of a trustee to abandon and dump property, Midlantic interpreted 554 that way. But that's all. Now, the suggestion is made that that's a terrible thing because federal law will equally be preempted. But they've forgotten something, the Supremacy Clause. It is simply not true that we take the position in our brief that we displace all law, federal as well as state. The language of 1123a-5, when it says notwithstanding any non-bankruptcy law to the contrary, to be sure, includes federal as well as state law. But as this Court has held on many occasions, when an immovable object is met by an irresistible force, if one is federal and the other is state, we know what the rule is. The federal one prevails. It's not true when they are both federal. Then you have a problem of harmonization, and that is a problem with which federal courts have struggled from the very beginning. As to what state law is displaced, I think you're getting a very wrong impression if the suggestion really is that all state law is displaced. Baker and Drake has nothing to do with this case. That's about the ongoing operation. Now, obviously, if it's proposed that the ongoing operation be illegal, certainly. I think I just heard you say that we needn't worry about the effect of the any clause when the competing law is not state but federal. Is that what I just heard you say? Not quite, Judge Fletcher. Not that you needn't worry, but that you are licensed to worry. That is, at that point, you have to worry about which prevails. Or I'll state it a different way, that when the competing law is federal rather than state, any doesn't mean any. No, any means any. But there is then a sheer contradiction. It's like writing on a piece of paper, the law on the other side of this paper is void, and then you say on the other side, this is. Any except some federal laws. No, I'm sorry. Law A says X. Yes. And it means X. Yes. Law Y passed by Congress says not X. Yes, I'm sorry. At that point, you have two laws to worry about, not just one. Yes, but the statute I have, it says, notwithstanding any otherwise applicable non-bankruptcy law. Right. And you would have me read that parenthesis, except there are going to be some federal non-bankruptcy laws to which this clause does not apply in the same way that it applies to state law. I understand, Judge Fletcher, that it would be. I think that's what you're saying to me. Not exactly. No, I'm sorry. I'm not quite saying that. If this says any non-federal, any – let me – suppose it was explicit. Suppose it said explicitly, this preempts – well, they wouldn't use the word preempts every other law, federal as well as state. Yes. Now, obviously, if Congress comes along the next year and says, here are three rules that you cannot ever violate, one of which is you can't violate the Trading with the Enemy Act in the way you transfer assets, including in bankruptcy, but they don't write that as amendment to the bankruptcy code. Right. You then have two irreconcilable laws, and you have a principle, the last in time prevails. Right. Sometimes the relevant tiebreaker will not be the last in time. They'll be inconsistent, but one will be more specific than the other. I understand. In that case, it's not that this law says any but doesn't mean it. It's that what it means is incompatible with another equally powerful congressional law that this one was not explicitly intended to repeal, and implied repeals are not favored. I understand what you're saying, but as soon as you say that, any doesn't mean any, and I'm not sure the bare force and quite blunt force of the Supremacy Clause means that any has to mean any with respect to state law once any doesn't mean any with respect to Federal law. Well, I think we could have a long metaphysical discussion of whether it's a matter of any meaning something else or whether it's a matter of having to square two inconsistent Federal laws with each other. Okay. But it seems to me that having to square is something you don't have to do when one is, in fact, are not licensed to do when one is Federal and the other is State. The ---- If this Court agreed with the Bankruptcy Court, you could make these same arguments to the Bankruptcy Court on implied. I think, Judge King, we would surely try, and I don't want to be stopped, but it would be a pale shadow of what we think we're entitled to. The reason is that certainty at the foundation of a reorganization is crucial. It's one thing to say that the precise interface of Federal and State law will be worked out case by case over time as a law operates. But it's another thing to say that the underlying legality of reorganizing transactions in the first place, whether there's any affirmative authority for them in the Federal law, and if there is, it displaces State law, is up for grabs until you have as-applied litigation. No one is going to lend billions of dollars to a new entity in the hope that in the chaos of as-applied litigation, it will all work out in the end. What I meant was that the Bankruptcy Court could make those rulings as implied. But, yes, Your Honor, but the Bankruptcy Court seemed to think that it had license to weigh, to mix and match, that is, to look ad hoc at the importance of the State policy as it came up, and at the nature of the Federal policy, and to come up with a policy mix of its own, a kind of junior varsity Congress, which we don't think a Bankruptcy Court is authorized to be. That would be different from putting a revised program out in the public and waiting for eternal lawsuits years later. Well, the point is that those eternal lawsuits would make it impossible to get the money up front in the first place, so reorganizations would fail, and the economic importance of the bankruptcy laws, which shouldn't be underestimated, I think leads us to think that it would be a crippling thing for the economy if you left a cloud to be resolved case by case in perpetuity over the question of whether there was power to reorganize a corporation in accord with Federal law. Our questions have taken you over your time. Thank you very much for your argument. Thank you, Your Honor. We'll hear rebuttal argument at this time. Your Honor, Your Honors. Let me address first PG&E's harmonization point, its claim that the notwithstanding clause works in a different way as applied to Federal law and State law. The meaning of nonbankruptcy established by Patterson, the Supreme Court decision, and by numerous other decisions is that both Federal and State law must be included. This notwithstanding clause demands that those two bodies of law be treated on the same basis. The principle of harmonization in the cases only applies where neither of the two allegedly conflicting Federal statute contains a direction as to which one will prevail. The notwithstanding clause is the clearest sort of direction of that kind, and consequently PG&E's theory necessarily requires displacement of Federal law. In addition, PG&E's theory is that the notwithstanding clause works on a self-executing and automatic basis without even identification of the displaced laws, whereas harmonization necessarily implies, of course, identification of the conflicting laws and examination of their competing regulatory objectives. Now, Judge Fletcher asked about the meaning of whether we think any means any. It is we do think that any means any. The question is what is the domain of the preempted laws. We say that the preempted laws are limited to those that regulate plan contents rather than substantive plan legality. Indeed, it's PG&E, we submit, that carves out exceptions to the logical force of its argument, such as its claim that tax laws aren't affected, its claim that Federal laws are carved out, its claim that it's only the moment of implementation on ongoing. Within the narrow scope of preemption, it is our position that any means any. Preempted laws are limited to the domain of laws that regulate plan contents, not substantive plan legality. Our position on A6 is absolutely consistent with our position on the – with our general position on the meaning of the Notwithstanding Clause. As I indicated in my opening argument, our position is that subsection A6, as – the Notwithstanding Clause, as applied to A6, preempts laws that affect plan contents, like, for example, a State law or a charter provision that required permission from the board of directors before a plan can propose the charter amendments required by A6. Professor Tribe alluded to Section 1125. That's discussed in our briefs, but that relates to the disclosure statement, not to the plan itself. Professor Tribe discussed Section 217 of the former Bankruptcy Act. As we discussed in our briefs, there was – Section 217 was never treated as having preemptive force displacing regulatory laws. And, indeed, as the opening brief discusses, the Chandler Act specifically amended the prior Bankruptcy Act to remove a section, the full power and authority clause, precisely for the reason that it might have been misconstrued to grant a debtor to undertake reorganization transactions in violation of State corporation law. So both the cases and the legislative history is incompatible with the provision that there was preemption under the Bankruptcy Act. I need to wrap up. Let me make as my concluding point, note that Professor Tribe embraced the position that the 78 Code, as enacted at the time, preempted all of the regulatory laws at issue here, and that PG&E's theory, it was implicitly an opinion, depends on that proposition. If you look at Baker and Drake, if you look at the text of the 78 version of 1123A, if you look at the presumption against preemption, we submit that that argument is plainly wrong. Thank you very much. Thank both counsel, all counsel, for their arguments. They're really quite helpful. It's a difficult, complicated case. I'd hate to be responsible for the lawyer fees represented in this room. That was before. The case just argued will be submitted for decision, and we'll try to get a decision to you promptly.
judges: Hawkins, W.fletcher, King